[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
{¶ 1} Relator, James M. MacKenzie, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order to the extent that it denies temporary total disability ("TTD") compensation beyond January 2, 2002, on grounds that relator refused a job offer from respondent Ford Motor Company ("Ford") and to enter an amended order granting TTD compensation beyond January 2, 2002.
 {¶ 2} The matter was referred to a magistrate of this court, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate rendered a decision and recommendation, which included comprehensive findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate concluded that the commission abused its discretion in denying TTD compensation beyond January 2, 2002, on grounds that relator refused a job offer from Ford and recommended that this court grant relator's request for a writ of mandamus. Ford has filed objections to the magistrate's decision.
 {¶ 3} Ford's objections to the contrary, this court finds that the magistrate properly discerned the pertinent legal issues and applied the applicable law to those issues. Having completed an independent review of the file, this court finds no error of fact or law in the magistrate's decision. Accordingly, this court hereby overrules Ford's objections and adopts the magistrate's decision as its own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, this court issues a limited writ of mandamus ordering respondent commission to vacate the May 14, 2002 order of its staff hearing officer denying TTD compensation beyond January 2, 2002, on grounds that relator refused Ford's job offer and, in a manner consistent with the magistrate's decision, to enter a new order that determines relator's entitlement to TTD compensation beyond January 2, 2002.
Objections overruled; limited writ granted.
BRYANT and TYACK, JJ., concur.
 IN MANDAMUS {¶ 4} In this original action, relator, James M. MacKenzie, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order to the extent that it denies temporary total disability ("TTD") compensation beyond January 2, 2002, on grounds that relator refused a job offer from respondent Ford Motor Company ("Ford") and to enter an amended order granting TTD compensation beyond January 2, 2002.
 {¶ 5} Findings of Fact:
 {¶ 6} 1. On November 14, 2001, relator injured his right ankle while employed as an hourly worker at Ford's plant located in Batavia, Ohio. The injury occurred as relator stepped down from a platform onto a floor grid, twisting his ankle. He was taken by ambulance to a hospital emergency room where the ankle was x-rayed and treated.
 {¶ 7} 2. Prior to the industrial injury, relator was treated for right ankle problems by orthopedist Sandra A. Eisele, M.D.
 {¶ 8} 3. On November 16, 2001, two days after the industrial injury, relator visited Dr. Eisele. For her office note of that date, Dr. Eisele wrote:
 {¶ 9} "* * * He is 41 years old and injured his ankle at work on November 14 * * *. He was seen at Mercy Anderson Hospital and was put on crutches and he is here for evaluation. I have recently seen him for evaluation of his right ankle at the other office.
 {¶ 10} "PHYSICAL EXAMINATION: On exam today he has a fair amount of swelling and ecchymosis laterally and medially so he has a significant ankle sprain. Distal pulses, sensation, motor exam and skin are normal. He does have limited motion because of pain and swelling and really has a significant ankle sprain.
 {¶ 11} "X-RAYS: X-rays are reviewed and he perhaps has a small avulsion fracture on the tip of the lateral malleolus though I would have to compare these X-rays just obtained a week or two ago to see if it is new or old finding. Even if it is new it is a very small avulsion fracture.
 {¶ 12} "IMPRESSION: Grade II to III Sprain right ankle.
 {¶ 13} "PLAN: I have put him in a boot today. I have given him a prescription for Percocet and a note to be off work for three weeks and I will see him back in the office in about two weeks for recheck and hopefully we can start him on therapy."
 {¶ 14} 4. Relator's next visit with Dr. Eisele occurred on December 11, 2001. Dr. Eisele's December 11, 2001 office note states:
 {¶ 15} "* * * On examination today he still has a fair amount of swelling of the ankle joint and he has a little bit of motion. He really now at this point needs to start with therapy. He still has pain in his distal Achilles tendon and some discomfort on the lateral aspect of the lateral malleolus.
 {¶ 16} "Examination shows the swelling of the ankle joint is still there though it is better. There is tenderness along the distal fibula.
 {¶ 17} "* * *
 {¶ 18} "IMPRESSION: Grade II to III ankle sprain and pre-existing right ankle arthritis with bone spurs.
 {¶ 19} "PLAN: We will send him back for an MRI scan of the right ankle to be compared to the MRI scan done on 11/2/01. We will send him back to work on December 17 for sit down work only for a month. In the meantime, we will try and get that MRI scan done and I have also started him on physical therapy and he can progress to full weight bearing in the boot as tolerated. Return visit post MRI."
 {¶ 20} 5. On December 12, 2001, relator filed a First Report of Injury, Occupational Disease or Death ("FROI-1") alleging the November 14, 2001 industrial injury at Ford. Apparently, Ford, a self-insured employer under Ohio's workers' compensation laws, refused to certify the industrial claim.
 {¶ 21} 6. On December 13, 2001, Dr. Eisele completed a form prepared by Ford. Ford's form is captioned: "Medical Certification Form for Hourly Employees, Request for Leave of Absence for Employee's Own Health Condition." The form instructs the treating physician to send the completed form to the Batavia plant's medical department.
 {¶ 22} The form asks the treating physician to indicate the "expected duration of present disability?" In response, Dr. Eisele wrote "11/16/01 [thru] 12/17/01." The form also asks the treating physician "what is the return to work date?" In response, Dr. Eisele wrote "12/17/01 with restriction sit down job only."
 {¶ 23} 7. On December 20, 2001, Dr. Eisele completed bureau form C-9, which is used to request authorization of medical services. On the C-9, Dr. Eisele requested authorization for an MRI of the right ankle and for physical therapy for the right ankle. Apparently, Dr. Eisele faxed the completed C-9 to Ford on December 20, 2001.
 {¶ 24} 8. On December 21, 2001, Diane M. Meyer ("Meyer"), Ford's Workers' Compensation Administrator, faxed Dr. Eisele a letter stating that Ford had received the C-9 and that the MRI request was approved "for Diagnostic reasons only." (Emphasis sic.) On the C-9, Meyer wrote "this claim has not been allowed yet," an apparent reference to the physical therapy request. In short, on December 21, 2001, Ford approved the MRI request, but refused to rule on the physical therapy request pending a hearing on the claim allowance.
 {¶ 25} 9. In the meantime, Meyer wrote a letter dated December 20, 2001, to relator, stating:
 {¶ 26} "We, the employer, wanted to inform you in writing that Dr. Eisele, your treating physician, has informed us that you can return to work as of December 17, 2001, to a `Sit Down Only' restricted job.
 {¶ 27} "Dr. Farooqui, the plant medical doctor, spoke with your doctor on December 13, 2001. Plant Medical has made several telephone calls to your home informing you that your doctor had cleared you to return to work with restrictions.
 {¶ 28} "You are to report to Plant Medical on Friday, December 21, 2001 to be cleared to return to your light duty job. Please report prior to the beginning of your regular shift, so you can clear through Plant Medical.
 {¶ 29} "Attached is a copy of the Job Description for the light duty job you will be performing. Also attached is a copy of Dr. Eisele's release." (Emphasis sic.)
 {¶ 30} 10. At oral argument before the magistrate, Ford's counsel stated, without objection, that the reference in Meyer's December 20, 2001 letter to "Dr. Eisele's release" is a reference to the Ford form completed by Dr. Eisele on December 13, 2001, as previously noted.
 {¶ 31} 11. There is no evidence in the record upon which the trier of fact could conclude that Meyer had in her possession Dr. Eisele's office note of December 11, 2001, when she sent her letter of December 20, 2001 to relator. At oral argument, Ford's counsel conceded to the magistrate that he could not state whether or not Meyer had Dr. Eisele's December 11, 2001 office note when she drafted and sent her December 20, 2001 letter to relator.
 {¶ 32} 12. The "Job Description" attached to Meyer's December 20, 2001 letter, provided:
 {¶ 33} "Light Duty/Restricted Duty Job
 {¶ 34} "Work Location: Department 842
 {¶ 35} "Job Description:
 {¶ 36} "This is a Sit Down Job.
 {¶ 37} "Responsible for picking debris off of the pallets
 {¶ 38} "We can adjust the hours as needed with restrictions
 {¶ 39} "Sent via Airborne Express on 12/20/01."
 {¶ 40} 13. Airborne Express Tracking indicates that Meyer's December 20, 2001 letter was delivered to relator's residence on December 21, 2001 at 6:41 p.m., after the time that relator was instructed by Meyer's letter to report to plant medical.
 {¶ 41} 14. On December 27, 2001, relator entered Ford's Batavia plant while using crutches. Ford's security then transported relator to the plant medical department. This event prompted a Ford memorandum from David Smith to Cyril Puthoff dated January 10, 2002. The Smith memorandum to Mr. Puthoff stated:
 {¶ 42} "Upon arrival in the Medical Department, I found Mr. Mac[K]enzie sitting in the waiting area with a pair of crutches with him. He stated that he had a return to work slip and was reporting to work. I advised Mr. Mac[K]enzie that he could not go out on the plant floor using crutches. He stated that he had a slip to return to work in Dept. 842 (I believe), I again told him that it is our policy not to permit anyone with crutches to be on the plant floor. He asked me if I would put that in writing, I told him that I did not have a problem with that and then told him I would be back in just a minute and left the room.
 {¶ 43} "I then contacted Cyril Puthoff to verify that it would be permissible for me to write a statement saying that it is our policy not to permit employees to work with crutches. Mr. Puthoff advised me that it was not necessary to put that in writing since Mr. Mac[K]enzie is well aware of our policy.
 {¶ 44} "I returned to the Medical Department and informed Mr. Mac[K]enzie that I had spoke with Mr. Puthoff and he said it was not necessary to write a statement since Mr. Mac[K]enzie was well aware of our policy. Mr. Mac[K]enzie then asked what he was to do now since he is supposed to be reporting to work. I told him that I wasn't sure since I had no foreknowledge of him coming in or being assigned to report to any department. But, I could tell him that he will not be permitted to go out on the plant floor with crutches. He then commented that he thought it also was strange that he was to report while on crutches but he said that he had a notice to report to work.
 {¶ 45} "Mr. Mac[K]enzie then questioned how he was going to get back to his car since he was on crutches and stated he almost fell coming in. I told Mr. Mac[K]enzie that I would take him to his car and we left the building. During the time from the Medical Department to his car I informed Mr. Mac[K]enzie the safety concerns that someone with crutches on the plant floor would cause. He agreed and said he felt it was silly that he was to be reporting while on crutches. He also said how difficult it has been being on crutches this whole time and that he was bored from not being able to do anything. I again told Mr. Mac[K]enzie I was not sure on what he should do next since I was not involved in his return to work notice."
 {¶ 46} 15. On January 2, 2002, Meyer sent another letter to relator via Airborne Express. Paragraphs one, two, and four of the January 2, 2002 letter are identical to Meyer's December 20, 2001 letter. However, paragraph three reads as follows:
 {¶ 47} "You are to report to Plant Medical immediately to be cleared to return to your light duty job. Please report prior to the beginning of your regular shift, so you can clear through Plant Medical."
 {¶ 48} 16. On January 7, 2002, Ford's plant physician, Dr. Farooqui, wrote to Dr. Eisele as follows:
 {¶ 49} "* * * [A]s I pointed out to you in a conversation we had on Friday, January 4, 2002, J. Michael Mac[K]enzie has not returned to the light duty job you released him too [sic].
 {¶ 50} "He did return to our plant on December 27th using crutches. I have attached our plant medical notes from that visit. This is what prompted me to call you again in regards to J. Michael MacKenzie's need for crutches.
 {¶ 51} "In a conversation we had on Friday, January 4, 2002, you informed me that J. Michael MacKenzie could get around with out [sic] the crutches, and that they were not medically necessary at this time.
 {¶ 52} "If you are in agreement with the above statement, please sign the acknowledgement below and return to my office." (Emphasis sic.)
 {¶ 53} Dr. Eisele signed the acknowledgement and returned it to Ford medical.
 {¶ 54} 17. On January 7, 2002, relator's counsel sent the following letter to Meyer:
 {¶ 55} "I have been retained to represent J. Michael Mac[K]enzie in his workers' compensation claim. In that regard, I have spoken with Mike about your letters of December 20, 2001 and January 2, 2002 which purport to make a `good faith' job offer to him.
 {¶ 56} "As you are aware, your letter of December 21, 2001 [sic] commanded Mr. Mac[K]enzie to report to Plant Medical `prior to the beginning of your shift' of Friday, December 21, 2001, to be cleared to return to a light duty job. This letter was thoughtfully left at his front door at 6:41 p.m. on Friday, December 21, 2001 making it impossible to comply with your dictates.
 {¶ 57} "On the next date that the plant was open, December 27, 2001, Mr. Mac[K]enzie went to the plant and was approached by Mike Piccirillo of Plant Security. * * * After some discussion, Mr. Mac[K]enzie was transported to Plant Medical.
 {¶ 58} "After arriving at Plant Medical, my client was informed by Nurse Lee Smith that he was to see the doctor. When she was shown your letter which did not indicate that he was to be seen by the company doctor, Ms. Smith instructed Mr. Mac[K]enzie to have a seat, whereupon she left.
 {¶ 59} "After several minutes, David Smith from the Health and Safety Department came into the medical office and instructed Mr. Mac[K]enzie that he could not work while on crutches and that he was not to return to the plant until he was off of his crutches. When shown your letter with the job description which you attached in `good faith', Mr. Smith reiterated that Mr. Mac[K]enzie could not be in the plant while he was on crutches and that he was not to return until he was off of the crutches. * * *
 {¶ 60} "On January 4, 2002, Mr. Mac[K]enzie found your letter, dated January 2, 2002 on his doorstep. You have attached the same job description to this `good faith' job offer and, since nothing has changed in my client's medical condition, you are obviously aware that he cannot comply with your commands.
 {¶ 61} "It is clear that your attempted punitive actions against Mr. Mac[K]enzie are in retaliation for his having filed a claim under the workers' compensation act. Pursuant to Section 4123.90, Ohio Revised Code, you are hereby notified of a claimed violation." (Emphasis sic.)
 {¶ 62} 18. On January 7, 2002, relator visited Dr. Eisele whose office note of that date states:
 {¶ 63} "* * * The patient is seen today in follow-up. When I last saw him on December 11 or December 12 [sic], I sent him back to work on December 17 to a sit down job only. He said he did not show up at that time because he was not offered a job, and then apparently he showed up on December 21 [sic], but was sent home because he was still on crutches. I told him when I saw him in the office that he could get off crutches as soon as it was comfortable. He thought I had told him that he could only get off crutches when the physical therapist told him he could get off crutches. He says that his claim and physical therapy have been denied, so he hasn't had any therapy either. He also completely forgot to go to get his MRI scan on December 31, and so he called and rescheduled it for January 2. He comes in today still in his boot and on crutches. He says he has been using his crutches even at home most of the time. He is having pain in multiple areas in his ankle and it is stiff and it hurts.
 {¶ 64} "* * *
 {¶ 65} "PLAN: I told him that I want him to get off the crutches as I had told him at his last visit. We have opened up the hinges to his boot to full motion. He has been to therapy in the past for at least his left ankle, so he knows what exercises to do, and I told him to start with all the flexibility exercises that he can do on his own, since we apparently will not be able to get physical therapy. I've given him a note to return to a sit down job only wearing the boot but not crutches starting tomorrow, January 8. * * *"
 {¶ 66} 19. According to the sworn testimony of Cyril Puthoff (who testified before a staff hearing officer on May 14, 2001), relator was discharged from his employment at Ford effective January 9, 2002. (Tr. 14.)
 {¶ 67} 20. Following an April 2, 2002 hearing, a district hearing officer ("DHO") issued an order allowing the claim for "Grade II to III sprain right ankle," based upon Dr. Eisele's reports. The DHO found that Ford did not make a job offer on January 2, 2002 in good faith. The DHO awarded TTD compensation from November 16, 2001 to March 26, 2002, based upon the C-84 reports and records from Dr. Eisele.
 {¶ 68} 21. Ford administratively appealed the DHO's order of April 2, 2002. Following a May 14, 2002 hearing which was recorded and transcribed for the record, a staff hearing officer ("SHO") issued an order stating that the DHO's order of April 2, 2002 was being modified. The SHO affirmed the DHO's allowance of the claim.
 {¶ 69} However, the award of TTD compensation was modified. In that regard, the SHO's order states:
 {¶ 70} "As on preliminary matter, the transcript was received on 06/12/2002, even though it is date stamped 06/02/2002.
 {¶ 71} "* * *
 {¶ 72} "Temporary total compensation is awarded from 11/16/2001 through 01/02/2002, closed period based on the C-84 forms from Dr. Eisele, her off work slips, and treatments. The SHO specifically finds that the claimant is not entitled to temporary total compensation beyond 01/02/2002 due to a refusal of a valid light duty job offer from the employer.
 {¶ 73} "The light duty job offer history is as follows: The employer initially made a written job offer by letter dated 12/20/2001. This requested the claimant to return to work on 12/21/2001. However, this offer was not received until the evening of 12/21/2001. The employer conceded at the SHO hearing that due to the late receipt of this offer, this was not a valid job offer.
 {¶ 74} "The employer issued the same job offer again on 01/02/2002 with the only change that the claimant return to work immediately.
 {¶ 75} "As noted by the DHO, in the aftermath of the 1st job offer (delivered on 12/20/2001), claimant appeared at the company on 12/27/2001. At that time he was using crutches. Claimant was told that he could not be on the employer's premises while using crutches.
 {¶ 76} "In light of the above, one needs to scrutinize the medical records. Claimant saw Dr. Eisele on 12/11/2001 and 01/07/2002. Dr. Eisele recommended a sit-down job only on both occasions. There was no mention or requirement for the claimant to use crutches. The 12/11/2001 office note recommends physical therapy and suggested that the claimant progress to full weight bearing without crutches as tolerated. Claimant contended at hearing that physical therapy was denied. However, Ms. Meyers [sic] testified at the SHO hearing that she did not deny any request for physical therapy in December of 2001 and January 2002 because she never received any request.
 {¶ 77} "On 12/13/2001, Dr. Eisele completed an initial release to return to work in a light duty capacity form. On that form, claimant was released to return to work on 12/17/2001 with the restriction of a sit down job only. It mentions that claimant should be in a boot. There is no mention of the claimant using crutches.
 {¶ 78} "As a result of the claimant's appearance at the company premises on 12/27/2001 wearing crutches, the company physician, Dr. Farooqui, wrote to Dr. Eisele on 01/07/2002. In that letter, Dr. Farooqui recounted a 01/04/2002 conversation with Dr. Eisele in which Dr. Eisele indicated that claimant could get around without crutches and that they were not medically necessary. Dr. Eisele acknowledged that this was correct.
 {¶ 79} "It is also noted that claimant saw Dr. Eisele on 01/07/2002. The office note for that date indicates `I told him that I want him to get off the crutches as I had told him at his last visit.' She also states `I've given him a note to return to a sit down job only wearing the boot but not crutches starting tomorrow, January 8.' The last visit prior to 01/07/2002 was on 12/11/2001.
 {¶ 80} "In light of the aforementioned facts, the SHO finds that the employer made a good faith offer of a light duty job consistent with Dr. Eisele's restrictions. Claimant never responded to the 01/02/2002 job offer from the employer and, as such, this constitutes a refusal of the light duty job offer from the employer. Accordingly, temporary total disability compensation is not payable beyond 01/02/2002."
 {¶ 81} 22. On July 12, 2002, another SHO mailed an order refusing relator's and Ford's administrative appeals from the SHO's order of May 14, 2002.
 {¶ 82} 23. On September 9, 2002, relator, James M. MacKenzie, filed this mandamus action.
 {¶ 83} Conclusions of Law:
 {¶ 84} The commission refused to award TTD compensation beyond January 2, 2002, on grounds that relator had failed to respond to Ford's January 2, 2002 job offer. The magistrate finds that the commission abused its discretion in that regard. Accordingly, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 85} R.C. 4123.56(A) provides that TTD compensation shall not be paid "when work within the physical capabilities of the employee is made available by the employer."
 {¶ 86} Supplementing the statute, Ohio Adm. Code 4121-3-32(A) provides the following definitions:
 {¶ 87} "(3) `Suitable employment' means work which is within the employee's physical capabilities.
 {¶ 88} "* * *
 {¶ 89} "(6) `Job offer' means a proposal, made in good faith, of suitable employment within a reasonable proximity of the claimant's residence. * * *"
 {¶ 90} Ohio Adm. Code 4121-3-32(B)(2) provides that TTD compensation may be terminated after a hearing:
 {¶ 91} "(d) Upon the finding of a district hearing officer that the employee has received a written job offer of suitable employment."
 {¶ 92} R.C. 4123.95 further provides that the workers' compensation statutes "shall be liberally construed in favor of employees and the dependents of deceased employees."
 {¶ 93} There is scant case law applying that portion of R.C.4123.56(A) noted above. The only mandamus case from the Supreme Court of Ohio involving that statutory provision is State ex rel. Coxson v. Dairy Mart Stores of Ohio, Inc. (2000), 90 Ohio St.3d 428.
 {¶ 94} In Coxson, the employer's job offer misstated the restrictions of the claimant's treating physician, Dr. Steele, who had authorized the claimant's return to light duty work. The Coxson court issued a writ of mandamus ordering the commission to vacate its determination that "claimant refused a legitimate light duty offer of employment." Id. at 431.
 {¶ 95} The Coxson court rejected the employer's contention that the job offer was sufficient because the employer had promised to "work with the physician to modify jobs within given restrictions or limitations." Id. at 433. The Coxson court explained:
 {¶ 96} "* * * The difficulty with accepting this argument is that it essentially legitimizes any job offer — no matter how inappropriate — under the guide of later modification. As noted previously, if a job offer is to be sufficient to stop TTC, it must be clear that the job is indeed within claimant's restrictions." Id. at 433.
 {¶ 97} In the view of this magistrate, given the above authorities, the issue before the commission, in determining whether relator had received a written job offer of suitable employment, was whether Ford's January 2, 2002 job offer was within the medical restrictions that Dr. Eisele gave to relator at the December 11, 2001 office visit. The commission should have focused its inquiry upon what the claimant reasonably understood his medical restrictions to be at the time he received the job offer and not upon what Ford understood the medical restrictions to be. Any miscommunication or lack of communication between Ford and Dr. Eisele should not inure to the detriment of claimant.
 {¶ 98} The magistrate finds that the commission's order strongly suggests that (1) it failed to correctly understand the issue before it[1], and (2) it misinterpreted the medical evidence before it.
 {¶ 99} While Dr. Eisele's December 11, 2001 office note does not mention the word "crutches," nor directly state that use of crutches is required as a medical restriction, it clearly leaves to relator some personal judgment as to the continuing use of his crutches. The office note states "he can progress to full weight bearing in the boot as tolerated." This statement poses a question. If full weight bearing cannot be tolerated, how is claimant to proceed? The obvious answer is that he should continue to use crutches as he attempts to progress to full weight bearing in the boot. At oral argument, Ford's counsel suggested that there is another answer to the above noted query. According to Ford's counsel, claimant could hop on his left foot without using crutches to the extent that he could not tolerate full weight bearing on the right foot.
 {¶ 100} Even if Dr. Eisele's December 11, 2001 instructions can be interpreted as Ford's counsel suggests, it is clear, nevertheless, that relator could reasonably interpret Dr. Eisele's December 11, 2001 instructions as permitting the use of crutches.
 {¶ 101} Again, the commission's inquiry should have been upon what the claimant reasonably understood his medical instructions to be, not upon Ford's view of Dr. Eisele's restrictions.
 {¶ 102} Ford points out that on January 4, 2002, Dr. Eisele informed plant physician Dr. Farooqui that relator "could get around with out [sic] the crutches, and that they were not medically necessary at this time."
 {¶ 103} There is a suggestion in the commission's order and by Ford in this action, that Dr. Eisele's response to Dr. Farooqui's January 7, 2002 letter, somehow clarifies the instructions that relator received from Dr. Eisele at the December 11, 2001 office visit. This suggestion is incorrect. Dr. Eisele made her statement to Dr. Farooqui over three weeks after she told relator that he was to "progress to full weight bearing in the boot as tolerated." Moreover, there is no evidence that Dr. Eisele's statement to Dr. Farooqui was timely conveyed to relator. Furthermore, Dr. Eisele's statement to Dr. Farooqui on January 4, 2002 occurred two days after Ford sent its job offer of January 2, 2002. It is clear that Dr. Eisele's January 4, 2002 statement is largely immaterial to the medical restrictions that relator could reasonably believe he was under following the December 11, 2001 office visit.
 {¶ 104} In her January 7, 2002 office note, Dr. Eisele refers to the December 11, 2001 office visit stating: "I told him when I saw him in the office that he could get off crutches as soon as it was comfortable."
 {¶ 105} Again, the January 7, 2002 office note recognizes that on December 11, 2001, relator was instructed to use his own judgment with respect to continued use of his crutches.
 {¶ 106} Nevertheless, Ford points out, as did the commission in its order, that Dr. Eisele also wrote "I told him that I want him to get off the crutches as I had told him at his last visit." Ford seems to suggest that this January 7, 2002 statement from Dr. Eisele can be used by the commission as some evidence to support a finding that relator was instructed on December 11, 2001, to completely discontinue use of the crutches. Ford's argument is premised upon a reading of the above quoted portion of Dr. Eisele's office note in isolation from the remainder of the office note. If anything, the January 7, 2002 office note, read in its entirety, confirms what was at least implicit in the December 11, 2001 office note — that relator was to use his own judgment in the continued use of his crutches.
 {¶ 107} It was not until the January 7, 2002 office visit that Dr. Eisele gave relator specific instructions to completely discontinue the use of his crutches. Even then, Dr. Eisele made her instructions effective the next day, January 8, 2002.
 {¶ 108} At the May 14, 2001 hearing, Ford's counsel framed the issue before the commission as follows:
 {¶ 109} "The third issue is the light duty offer. I think I can fairly simplify the issue in this regard. As these events were unfolding — that's really what you have to look at. What information had Doctor Eisele provided Ford Motor Company by way of a release to return to work to light duty, and how did Ford Motor Company respond to that information?
 {¶ 110} "What it essentially boils down to is whether or not Mr. Mac[K]enzie was under a crutch restriction at the time Doctor Eisele initially released him to return to work in a light-duty capacity. That's it. If you find Doctor Eisele released him on a crutch restriction, then the offer we made him would not have fit his restrictions. But Doctor Eisele didn't release him with a crutch restriction back in December of 2001.
 {¶ 111} "Let me show you exactly what Ford Motor Company got from Doctor Eisele. The first document that precipitated a light-duty job offer was the initial release to return to work in a light-duty capacity from Doctor Eisele, and it was dated December 13th of '01. It lists that he can go back to work December 17th of '01 with the restriction of a sit-down job only. It also indicates he should be in a boot. Okay? That's it.
 {¶ 112} "So in response to this document, and again it's in your file, we wrote Mr. Mac[K]enzie and we offered him a light-duty job, and that was the December 20th, light-duty job offer. When he didn't get that in time to respond to it, we made a second job offer. It was essentially the same job offer as the first one." (Tr. 9-10.)
 {¶ 113} To summarize, Ford argued at the hearing that the commission need only determine whether the job offer was within the restrictions set forth by Dr. Eisele on the Ford form that she completed on December 13, 2001.
 {¶ 114} As previously noted, at oral argument before the magistrate, Ford's counsel conceded that it is not known whether Ms. Meyer even had Dr. Eisele's December 11, 2001 office note when she drafted Ford's job offer.
 {¶ 115} Thus, Ford finds itself in the position of having to argue, albeit incorrectly, that Dr. Eisele's December 13, 2001 report to Ford is consistent with her December 11, 2001 office note. Clearly, Dr. Eisele's December 13, 2001 report to Ford fails to fully set forth the medical restrictions contained in the December 11, 2001 office note.
 {¶ 116} Moreover, Ford's form that Dr. Eisele completed on December 13, 2001, fails to instruct the physician completing the form that the information being supplied will be used to fashion a job offer. Thus, Ford is in no position here to argue that Dr. Eisele or relator should be held accountable for the failure to supply Ford with a full presentation of the medical restrictions.
 {¶ 117} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate the May 14, 2002 order of its SHO to the extent that TTD compensation is denied beyond January 2, 2002, on grounds that relator refused Ford's job offer and, in a manner consistent with this magistrate's decision, enter a new order that determines relator's entitlement to TTD compensation beyond January 2, 2002.
[1] The commission abuses its discretion when it fails to address in its order the critical issue before it. State ex rel. Peabody Coal Co. v. Indus. Comm. (1993), 66 Ohio St.3d 639.